# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 21, 2016

## STATE OF TENNESSEE v. DAVID WILLIAM LOWERY

**Appeal from the Circuit Court for Anderson County**
**No. A8CR0117     Donald R. Elledge, Judge**

_____

### No. E2015-00924-CCA-R3-CD – Filed March 30, 2016

_____

An Anderson County jury convicted the Defendant-Appellant, David William Lowery, as charged of three counts of aggravated child abuse. See T.C.A. § 39-15-402(a)(1) (Supp. 2007). The trial court imposed concurrent twenty-five-year sentences with a release eligibility of one hundred percent for each count. See id. § 40-35-501(i) (Supp. 2008). Lowery's sole issue on appeal is that the evidence is insufficient to sustain his convictions. Upon review, we affirm Lowery's convictions but remand the case for entry of corrected judgments in counts 1, 2, and 3 to reflect that he was charged with and convicted of three counts of aggravated child abuse and that these convictions are Class A felonies.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Mart S. Cizek, Clinton, Tennessee, for the Defendant-Appellant, David William Lowery.

Herbert H. Slatery III, Attorney General and Reporter; Lacy E. Wilber, Senior Counsel; David S. Clark, District Attorney General; Sandra N. C. Donaghy, Assistant Attorney General (at trial); and Anthony J. Craighead, Assistant District Attorney General (at sentencing and motion for new trial), for the Appellee, State of Tennessee.

## OPINION

Dr. Charles Machen, an expert in the field of pediatric medicine, testified that he was the pediatrician for the victim, D.L.,[1] and first examined the victim when he was six

_____

[1] It is the policy of the court to refer to minor victims by their initials.

days old. He also examined the victim in his office on November 28, 2007, to check the baby's jaundice and weight, and on December 14, 2007, at the baby's one-month checkup. On January 24, 2008, at the victim's two-month checkup, the victim's mother mentioned that the victim had not been moving his left arm as well as his right arm for the last two weeks. After examining the child, Dr. Machen noticed that the victim's eyes "failed to fix" or focus on his face the way a normal baby's eyes would. He also confirmed that the victim was not moving his left arm properly, and when he manipulated the victim's left arm, the victim cried for a short time. When Dr. Machen turned the victim on his stomach, he noticed a "fairly large bruise" in a "pattern similar to an open hand" on the victim's back below his left shoulder blade. The bruise appeared "fresh" because there was no "yellowing" of it. The victim's mother appeared "shocked" to see the victim's bruise and began to cry. She told Dr. Machen that she and her husband loved the baby and that "no one would hurt this baby and no one was losing their temper with the baby[.]" Because of the victim's bruise and the lack of movement in the victim's left arm, Dr. Machen informed the victim's mother that an x-ray needed to be taken of the victim's arm at the hospital and that he would have to report his findings to the Department of Children's Services (DCS). The victim's mother appeared cooperative.

The victim's mother and Lowery's ex-wife, testified that she stayed home with the victim and their older son while Lowery, the children's father, worked as an occupational therapist assistant. Although she took primary responsibility for feeding the victim, Lowery gave the victim his last feeding of the night. She did not know when Lowery went to bed because he stayed up later than she did and slept in a room with their older son. She described the victim as a "very calm baby." Although the victim "acted normal" when she was holding him, he "screamed a lot" when Lowery held him, and Lowery was unable to console him. At the time, she did not believe that anything was wrong with the victim.

When the victim was approximately two months old, his mother walked into a room and saw that Lowery had the victim "underneath his arms" and was "kind of rocking him back and forth." Lowery immediately stopped rocking the child when she entered the room, and the victim's mother told him that holding the victim in that manner was not good for the victim's neck. She said Lowery made her "feel like [she] was being over-protective" and "was overreacting" to how he was holding the victim.

The victim's mother said that when Dr. Machen examined the victim before the two-month checkup, everything was normal. She said that two days before the victim's two-month checkup, she noticed that something was wrong with the victim's arm. However, because the victim was eating fine, sleeping fine, and moving the rest of his limbs fine, she waited until the scheduled doctor's appointment to discuss it with Dr.

Machen. The morning of the victim's appointment, she spoke with her husband's sister, Susan Tipton, and told her she was thinking about taking the children to see her family in Illinois for a few weeks. She said Tipton was not happy about her taking the children and "threatened [her] with a baseball bat." When she left to take the victim to the doctor, Lowery was lying on the couch because he "had been throwing up all night."

At the victim's two-month checkup, the victim's mother told Dr. Machen that he was not moving his left arm properly, and after examining him, Dr. Machen agreed that something was "not right" with the victim's arm. When Dr. Machen turned the victim on his stomach, they both saw the bruise on the victim's back. The victim's mother said she had not seen the bruise before that moment and was "in shock[.]" She said the bruise looked like a hand print because she could see the finger marks from what looked like a fist. Dr. Machen asked the victim's mother if her older son could have caused the bruise, and she replied that it was impossible because she never left the victim alone with her older son. Dr. Machen instructed the victim's mother to take the victim to the hospital and told her that he was going to have to call DCS.

The victim's mother immediately returned home and picked up Lowery and her older son to go with them to the hospital. She also called their pastors from church, who were close friends, and the pastors agreed to meet them at the hospital. She said that on the way to the hospital, Lowery admitted that the victim's injuries "had to have been something [he] had done."

Upon arriving at the hospital, several x-rays were performed on the victim. The victim's mother said that "[t]hey just kept on finding more and more things and kept on coming and telling me more things were wrong with [the victim]." She was extremely worried about the victim and was alarmed because she did not know how the victim's injuries had occurred. A cast was placed on the victim's arm, which was broken, and the victim was admitted to the hospital. Physicians later told the victim's mother that in addition to having a broken arm, the victim also had sustained fractures to both legs and to several ribs. The victim's mother asserted that she had done nothing to cause the victim's injuries because she had never dropped, hit, or yanked the victim.

At the hospital, the victim's mother was interviewed by Detective Boucher, and she gave a written statement to him in the presence of DCS workers. Then Lowery was interviewed by Detective Boucher, although she was not present for his interview. That day, the DCS workers prevented the victim's mother from having contact with the victim or her older child, which made her feel "[h]elpless" and "awful."

That night, Lowery drove the victim's mother home. When they arrived, Lowery told her that it was "probably best for him to leave," and she acknowledged this was true.

She said someone had told her Lowery had admitted at the hospital to doing something to the victim.

The same night, the victim's mother's parents drove approximately seven hours from their home in Illinois to help her. Two-and-a-half months later, the victim was released back into his mother's custody. She immediately moved back to Illinois and divorced Lowery six months later. After moving to Illinois, the victim underwent physical therapy for one to two months. At the time of trial, the victim was a normal six-and-a-half year old boy. The victim had not suffered any fractures to his bones after moving to Illinois.

Ron Boucher, a detective with the Oak Ridge Police Department, testified that he responded to a call from DCS workers the night the victim was taken to the hospital. He met the DCS workers, who informed him that a two-month-old boy had come in with injuries, and talked to the victim's mother in a conference room in the presence of the DCS workers. During this interview, a physician informed them that the victim had more fractured bones. Detective Boucher said that while the victim's mother initially acted normal, she became "very emotional and started crying" when he asked her if she had injured her son, and she denied causing his injuries. Following their discussion, the victim's mother gave him a written statement, in which she stated that on the way to the hospital, Lowery suggested that the victim's bruise could have been caused by the victim falling asleep on him or his holding the victim the wrong way. She also wrote that Lowery said he could have hurt the victim's arm by picking up the victim the wrong way.

Detective Boucher next interviewed Lowery at the hospital. Lowery acted normal and could provide no explanation for the victim's fractured arm and ribs. When a physician interrupted the interview to inform Detective Boucher that the victim also had sustained fractures to his legs, Lowery appeared shocked and could provide no explanation for these injuries.

Lowery subsequently provided two written statements to Detective Boucher. In the first statement, which summarized his activities over the last twenty-four hours, Lowery did not mention anything about the cause of the victim's broken bones. When Detective Boucher asked him whether a person who had broken a two-month-old infant's bones deserved a second chance, Lowery responded that it would depend on the severity of the injuries and whether "it was a one-time thing" or whether it occurred "over a long period of time." Detective Boucher then asked Lowery what he and the victim's mother talked about on their way to the hospital. Lowery first said that the ride was quiet and that they did not place blame on one another; then he leaned back in his chair and stated, "[N]othing was on her, it's all on me." Detective Boucher asked Lowery about the victim's broken arm, and Lowery said he once grabbed the victim by his arm and

-4-

shoulders to get him out of the swing. When he asked about the broken ribs, Lowery said that although he did not know why, he started squeezing the victim, and when he heard a rib pop, he stopped. When Detective Boucher questioned Lowery about the victim's broken legs, Lowery said that when he was changing the victim's diaper, he grabbed the victim at mid-thigh and pulled him across the bed and stood him up. Lowery was unable to pinpoint a date or time when these acts occurred and could not tell Detective Boucher whether these acts occurred during a single incident or different incidents.

A short time later, Lowery provided a second written statement, witnessed by Detective Boucher but not the DCS workers, which included his prior admissions regarding the victim's injuries. To explain the victim's broken arm, Lowery wrote that he lifted the victim out of his swing by his left forearm and pulled the victim toward him. Lowery said that he slid both of his arms up to the victim's shoulders before lifting him to his chest, stating that he "guess[ed] the way [he] lifted him was too much pressure" on the victim's arm but that he had "no idea" that he exerted enough pressure to break the victim's left arm in two places. Lowery also admitted that when he picked up the victim to feed him, he "squeezed him with both [his] arms around each rib cage [sic] area," although he did not believe that he caused rib fractures at the time. He claimed the victim "never let out any cry in the days following" to let him or his mother know that something was wrong. Lowery wrote that when he was changing the victim's diaper, he "slid him towards [him] by [grabbing] both of his legs around mid-calf and started raising him slightly off the bed." He said he "got [the victim] at the wrong angle . . . and had no idea" that the victim's legs were broken until Detective Boucher told him of that fact. He said that finding out about the victim's broken legs "was a complete shock" because the victim never "let out a whimper, a cry, or even a moan." Finally, regarding the bruise on the victim's back, Lowery wrote that he "was trying to wake [the victim] up and [he] raked across his rib cage [sic] with [his] right knuckles" as he was attempting to get him to finish his bottle. He said he "had no idea of what [he] had just . . . physically done to [his] 2 month old."

During trial, the parties stipulated that the matters of fact contained in a tape recording and transcript of a juvenile court proceeding on January 29, 2008, were true, and both the recording and transcript were admitted into evidence. During the January 29, 2008 hearing, Lowery admitted that he squeezed his son for several seconds while his wife was asleep sometime between midnight and 2:30 a.m. Lowery said that when he heard something pop on the victim's left side, the victim made a noise like "uh." He asked himself what he was doing because his hands were around the victim before he "even realized [he] even had him[.]" He admitted that he did not seek medical attention for the victim after hearing the "pop" sound and did not tell his wife about the incident. He also admitted grabbing the victim by his legs to stand him up one time and, when he was exhausted, grabbing the victim by his arm to get him out of the swing. He said he

-5-

had "no idea" of the extent of the victim's injuries until they were at the hospital. Lowery asserted that he believed the victim got the bruise on his back from the way he laid him down. He asserted that his wife "would rather put a bullet in her head, than to scratch" either of her sons. He also stated that "as Jesus Christ is my witness, [his wife] is a perfect mom" and "would not harm [her sons]" in any way.

John Davis, a case manager for the child protective services unit for DCS, testified that he was called to the hospital on January 24, 2008, to respond to a child abuse case that was "coded severe." He gathered his paperwork and contacted Detective Boucher about the case. Upon arriving at the hospital, physicians told him that the victim had sustained eight to twelve broken bones. When Davis interviewed the victim's mother, she was in "disbelief and shock" that the child was injured and "did not have a concrete answer as to how the injuries occurred."

Davis's interview with Lowery lasted substantially longer than his interview with the victim's mother. At first, Lowery tried to guess certain situations that could have caused the child's injuries. Davis said Lowery "was a tad bit uncomfortable" and eventually talked to Detective Boucher alone. After approximately thirty to thirty-five minutes, Detective Boucher asked Davis to come into the conference room and gave him a synopsis of what Lowery had just told him. Davis said Lowery "seemed relieved that the truth was coming out." While Lowery was defensive and tried to "explain away" the victim's injuries during his first conversation, Lowery was "much more relaxed" and answered all of Detective Boucher's and Davis's questions during the second discussion.

Dr. Jeffrey Abrams, a pediatrician and an expert in the field of pediatric emergency room medicine, testified that he was working in the emergency room on January 24, 2008, when the victim came in after his initial x-rays had been taken. He observed "multiple small circular, what appeared to be, bruises, light bruises on his upper back" that were consistent with a hand print. He explained that it was "very unusual to have bruises on a two-month-old baby" because they do not move around enough to be injured.

Dr. Abrams said the victim also sustained multiple rib fractures. In addition, the victim had a healing fracture on his upper left arm and had fractures in the two bones in his lower left arm. He could tell that the victim was in pain from these fractures because when he tried to move the victim's left arm, he "appeared uncomfortable." The victim also had healing fractures on his right and left shin bones. When Lowery was told that the victim needed a CAT scan, he got angry and demanded to know why it was necessary. The CAT scan showed that the victim had "possible previous brain injury." Because of the fractures and the victim's abnormal CAT scan, the victim was admitted to the hospital so that he could be put in a cast and given medication for pain. Dr. Abrams

ultimately diagnosed the victim with "multiple fractures, non[-]accidental trauma, suspected abuse." He opined that the victim's fractures were the result of physical abuse.

Dr. Abrams did not observe any evidence of "nursemaid elbow," which is another name for a dislocated elbow that occurs when a child is yanked by his or her arm. He asserted that pulling a child out of a swing would not cause the victim's fractures; instead, the arm would have to be hit against something or twisted to result in fractures like those in the victim's left arm. In addition, leg fractures like those sustained by the victim required substantial pressure or force and resulted from a person "twisting" or "grabbing" the leg or the victim's legs being "struck against something." He opined that it was "almost impossible" to fracture an infant's legs by grabbing the legs at mid-calf and sliding the infant across a bed or changing table. Based on the tests he performed and the x-rays he examined, he saw no evidence that the victim had brittle bone disease.

Dr. Clifford Meservy, an expert in the field of pediatric radiology, testified that he reviewed the victim's x-rays and observed fourteen healing rib fractures on the left side and seven healing rib fractures on the right side. One of the victim's ribs had three fractures, and there was evidence that some of the ribs had been re-fractured from repetitive trauma. He said that he assumes a child with multiple rib fractures has been abused unless someone can provide an explanation for the fractures. He noted that even when CPR is performed on an infant, ribs rarely fracture, which meant that the victim's chest "was compressed far more than you do doing CPR which is rapid chest compressions at a hundred per minute." He opined that the victim's rib fractures occurred at least two weeks prior to the date the x-rays were taken.

Dr. Meservy said the victim sustained a fracture to a particular part of the humerus bone in his left arm, which was almost always a sign of abuse, and the humerus was also fractured at the top and bottom of the bone. In addition, the victim's ulna had two fractures that were more recent than the rib fractures and probably occurred within the previous eight days. Finally, the victim's radius bone had a fracture. The victim also sustained fractures to the humerus, scapula, and radius bones in his right arm. Dr. Meservy noted that the fracture to the victim's scapula, the bone normally called the shoulder blade, was very unusual and that this was the first time he had observed a fractured scapula in a child despite his years of medical practice. He said the presence of a scapula fracture alone was indicative of child abuse, and the victim's scapula fracture appeared to be at least two weeks old.

Dr. Meservy noted that the victim had also sustained a healing fracture to the "mid shaft" of the left tibia. Because the victim's broken leg had not been promptly set, refractures had occurred that resulted in "excessive callus formation" on the bone. The victim also sustained a healing fracture to the "mid shaft" of the right tibia, and the x-ray

indicated a re-fracture in this area. The victim's right femur was also fractured. Dr. Meservy stated that the variety of the fractures and the differing ages of the fractures indicated abuse. He also said the victim, who was approximately two months old, "had evidence of repetitive trauma, not just one event over a period of time."

After reviewing the victim's CAT scan, Dr. Meservy observed several dark, abnormal areas called encephalomalacia in the frontal lobes that represented a softening of the victim's brain. He opined that the dark areas, which were indicative of trauma, formed from hemorrhages in those areas.

After listening to Lowery's written statement regarding how he believed the victim's injuries occurred, Dr. Meservy said that although Lowery could have possibly injured the victim's arms in the way he described, Lowery's version of how the victim's ribs and legs were fractured did not seem plausible and did not match the victim's x-rays. He noted that the tibia and the femur are the strongest bones in the body and that it would require a "direct blow to fracture those bones." After examining the victim's x-rays, Dr. Meservy did not see "anything radiographically to suggest . . . that this baby [was] suffering from any type of disease that [was] making [his] bones weak[.]" He also said that if the victim had suffered no further fractures since his hospitalization, this would imply that the victim did not have brittle bone disease, otherwise known as osteogenesis imperfecta.

Dr. Marymer Perales, an expert in the field of pediatrics and child abuse pediatrics, testified that when she examined the victim in the hospital, he had a splint on his left arm. She said the victim's left arm fractures were less than ten to fourteen days old because he did not have any callus formation on the bones. By the time of her examination, the victim had received several doses of pain medication, which was a combination of Tylenol and Hydrocodone or Tylenol and Codeine. She explained that nurses review a child's heart rate and blood pressure to determine if the child is in pain and opined that "if the nurses were giving the medication[,] the [victim] was exhibiting . . . signs of pain."

Dr. Perales reviewed the victim's x-rays and noted that the victim had thirty fractures, including healing and new fractures. She said it was often difficult for lay persons, and even physicians, to recognize that an infant's bones were fractured because swelling may be hard to observe in light of baby fat and because infants often cry even if they are healthy.

Dr. Perales stated that rib fractures in an infant are usually caused by direct blows or by squeezing the child and that the force necessary to fracture an infant's ribs would have to be "excessive and not in the natural course of caring for a child." She added that

the popping noise described by Lowery could have been the sound of the initial fracture or the sound of the rib grinding on itself before it began to heal. Moreover, she said that while a baby could fracture an arm if the arm was wedged between a parent's body and the arm of a chair, as described by Lowery, the victim in this case had several fractures to his left arm, which could not have occurred as Lowery described. She acknowledged that the victim's left arm fractures could have been caused by "jerking" or "pulling" the victim's left arm to pick him up, as described by Lowery. She said that such forces were "not . . . normal care-type forces" and if someone witnessed that type of event, they "would be concerned that the child was injured." Regarding the victim's scapular fracture, she stated that this fracture required a lot of force and was typically seen in things like car wrecks or motorcycle or airplane accidents. She asserted that Lowery's explanations could not have caused the fractures to the victim's right arm. Regarding Lowery's explanation of grabbing the victim's legs, sliding the child across the bed, and standing the child up, Dr. Perales stated that these actions "could explain some of the injuries that are seen in the lower extremities" but that she was unsure how someone "would stand up a two-month-old by the legs." She said the victim's leg fractures were caused by a "twisting, yanking motion" with "excessive force" that would have caused this child to cry. After examining the victim and reviewing the victim's tests and x-rays, she opined that the victim did not suffer from any bone conditions or diseases that would have caused these fractures.

Dr. Perales noted that the victim's CAT scan showed encephalomalacia, which meant the victim "had some kind of previous insult to that part of the brain." She said this finding was disconcerting, especially in light of the victim's other injuries. Dr. Perales opined that the victim had been injured multiple times because he had new and old injuries and that these injuries resulted from "non[-]accidental inflicted trauma." She also opined that the victim suffered "extreme physical pain" each time one of his bones was fractured.

Lowery, the Defendant-Appellant, testified that he was forty-seven years old and had two children. Lowery said that he would put his older son to bed, and his wife would stay up taking care of the victim from 9:30 to 10:15 p.m. each night. When his wife went to sleep, she would put the victim in the "floor swing," and Lowery would stay up until it was time for him to feed the victim around 1:30 or 2:00 a.m. After feeding the victim, Lowery would sit with the victim on the couch or put the victim in the "Pack and Play" in the room where his wife was sleeping before finally going to sleep in the room with his older son. Lowery remembered his wife telling him that the victim was not moving his left arm as well as his right arm. He held the victim, acknowledged that he was not moving his left arm as well, and gave the victim back to his wife because he did not know what was wrong.

The night before the victim's two-month checkup, Lowery awoke sick to his stomach around 2:00 a.m. He told his wife that she needed to feed the victim and vomited three or four times. The next morning, his wife took the victim to his two-month wellness checkup. She called him shortly thereafter, telling him that they needed to take the victim to the hospital and if they did not go, they would be reported to the Oak Ridge Police Department. Once they arrived at the hospital, his wife went into a room with the victim, and Lowery was not given any information regarding the victim's condition for two-and-a-half to three hours. He eventually found his wife, who told him that the victim had sustained rib fractures and a fracture to his left arm. Lowery acknowledged that he was "frustrated" at the time because no one explained what was happening. He claimed he did not object to the CAT scan but wanted to know why it was necessary.

When Lowery talked to Detective Boucher and the DCS employees, he was "in shock" about his son and "didn't know how to answer the question" of how the victim had received his injuries. After Lowery gave his first statement summarizing what he had done in the last twenty-four hours, Detective Boucher asked the DCS employees to leave the room, and when they were alone, Detective Boucher told him that if he did not begin cooperating in the investigation, he was going to ensure that he never saw his children again. Lowery said he was fearful that his children would end up in foster care. When he gave his second statement, Lowery was "trying to rack [his] brain" for an explanation as to how the victim had received his injuries. He said he tried to "write something that would . . . satisfy" Detective Boucher.

After reading his second statement, Lowery denied jerking the victim out of his swing, denied squeezing the victim to the point of breaking the victim's ribs, and denied doing anything other than sliding the victim across the bed. He also denied raking his knuckles across the victim's ribs and said he included that admission in his statement only because Detective Boucher "threatened" him. Lowery admitted that there was one incident when he had fallen asleep, and the victim had slid between him and the armrest, and he picked the victim up quickly, and he was fine. Lowery denied throwing the victim against a wall or the floor. He asserted that he had never mishandled the victim in any way and was shocked that the victim "had one fracture, let alone that many."

As to his statement that "it's on me; it's not on [his wife]," Lowery said he made that statement in order to keep his children out of state custody after Detective Boucher "threatened" him. He said "he would have confessed to anything" because he loved his children, "couldn't stomach the idea of them being in [the] custody of strangers[,]" and wanted his wife to be able to see their children.

Lowery did not agree with his wife's testimony that the victim was inconsolable when he held him. He said there were several occasions when the victim was crying

while his wife was holding him, and he would take the victim, walk him around, and the victim would stop crying. He denied telling his wife on the way to the hospital that the victim's injuries must have been caused by something he had done.

Lowery acknowledged that his wife had once criticized him for the way that he was holding the victim, although he denied swinging the victim back and forth. He said he had never observed his wife harming the victim or doing anything to make him believe she had hurt the victim. He did not believe that any other family members would have harmed the victim.

Susan Tipton, Lowery's older sister, testified that she would not try to protect her brother if she believed he had hurt the victim. She acknowledged having an argument with her brother's wife when she found out his wife was thinking of taking the children to Illinois for several weeks, but she denied threatening his wife with a baseball bat.

Mary Ann Nicely, who was Lowery's younger sister, testified that Lowery was a "great father." She could not imagine Lowery hurting his son.

Samuel Oakes, an elder at Lowery's church in Knoxville, testified that he had known Lowery his entire life and trusted Lowery around his children, grandchildren, and great-grandchildren. He said that Lowery had worked in the children's ministry at church and had never received a complaint. He was shocked about this case because Lowery "couldn't even hurt a dog much less a kid."

Jeffrey Oakes, Samuel Oakes's son and a pastor of a church in Johnson City, testified that he also had known Lowery his entire life. He was shocked when he heard about this case "because [Lowery] always loved kids and loved to be around children" and because he had never known him "to be violent in any way, shape, form or fashion." He said that Lowery was one of the youth leaders at church and that he had never observed Lowery behaving inappropriately around the children.

Lora Dowling, Samuel Oakes's daughter, testified that she had known Lowery her whole life and that he was her "best friend." She said Lowery had lived with her current family for almost two years following his arrest. She was "absolutely shocked" when she heard of Lowery's charges because "[t]his was out of character for who he is." Dowling said that she had observed Lowery around her children and his children and had never seen him behave inappropriately. When Lowery and his family visited her family four or five weeks before the victim went to the hospital, Dowling noticed nothing wrong with the victim and observed no tension between Lowery and his wife.

Robert Ellis testified that he had known Lowery for twenty years through church. Ellis said Lowery was "very good with kids" and had served as a Sunday school teacher and camp counselor at their church. When he heard about the victim's injuries, he "didn't think [Lowery] could have done it because [he had] never seen him real angry or acting like that with any kids."

## ANALYSIS

Lowery argues that there is insufficient evidence to sustain his convictions. Referencing the pattern jury instruction for circumstantial evidence given in this case, he asserts that the State failed to present sufficient proof for the jury to find that "all the essential facts were consistent with the hypothesis of guilt" and that "the facts excluded every other reasonable theory or hypothesis except that of guilt." He also claims that the evidence was not "of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant, and no one else, committed the offense."

The record shows that the trial court provided the following jury instruction on circumstantial evidence that was in effect at the time the offenses in this case were committed:

> When the evidence is made up entirely of circumstantial evidence, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince the mind beyond reasonable doubt that the defendant is the one who committed the offense. It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury beyond a reasonable doubt of all the facts necessary to constitute the crime charged. Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant, and no one else, committed the offense.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.03 (12th ed.) (amended in 2011 for 15th ed.). In State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011), the Tennessee Supreme Court held that the State has no duty to exclude every hypothesis except that of the defendant's guilt beyond a reasonable doubt and that direct evidence and circumstantial evidence are treated the same when weighing the sufficiency of the

evidence. In light of Dorantes, Tennessee Pattern Jury Instructions 42.03 and 42.03(a) were amended. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim 42.03 and 42.03(a) (15th ed.). If the offenses in this case had occurred after Dorantes, the trial court should have given the following instruction to the jury regarding circumstantial evidence:

It is your duty to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, or say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.03 (15th ed.).

Because the trial court instructed the jury on circumstantial evidence using the Tennessee Pattern Jury Instruction that was in effect at the time of the offenses, we conclude that this instruction contained a fair and accurate statement of the law. See State v. April Jenkins, No. E2007-02519-CCA-R3-CD, 2009 WL 137208, at *5 (Tenn. Crim. App. Jan. 21, 2009) (concluding that the self-defense instruction contained a fair and accurate statement of the law because it "tracked, almost word for word, the language of the pattern jury instruction applicable at the time of the offense"). Moreover, though not raised by either party, we conclude that the trial court's failure to apply a pattern jury instruction adopted after the offenses occurred does not constitute "plain error." See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (establishing the five factors that should be considered by this court when determining whether an error is "plain error."). The jury instruction given in this case required the State to exclude every hypothesis except that of the defendant's guilt beyond a reasonable doubt, making it more difficult to convict Lowery based upon circumstantial evidence. Therefore, we cannot conclude that a substantial right of the accused was adversely affected, that the accused did not waive the issue for tactical reasons, or that consideration of the error is necessary to do substantial justice. See Adkisson, 899 S.W.2d at 641-42. As we will explain, the proof is sufficient to sustain Lowery's three convictions for aggravated child abuse.

Lowery argues that because the medical experts opined that the victim's injuries could not have been caused by the conduct described in his written statement, the State failed to produce sufficient evidence that he was responsible for the victim's injuries. He adds that "[t]he jury verdict in this case seems to be founded in guess or speculation" as to his guilt. See State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (stating

-13-

that a conviction "may not be based solely upon conjecture, guess, speculation, or a mere possibility").

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." Dorantes, 331 S.W.3d at 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). Moreover, the standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). The jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

Lowery was convicted of three counts of aggravated child abuse. Count 1 charged him with aggravated child abuse by breaking the victim's arm, count 2 charged him with aggravated child abuse by breaking the victim's ribs, and count 3 charged him with aggravated child abuse by breaking the victim's legs.

A person commits the offense of aggravated child abuse when he or she "knowingly, other than by accidental means, treats a child under eighteen (18) years of

-14-

age in such a manner as to inflict injury" and the "act of abuse . . . results in serious bodily injury to the child[.]" Id. §§ 39-15-401(a), -402(a)(1) (Supp. 2007). If the abused child is eight years of age or less, as the victim was in this case, the offense is a Class A felony. Id. § 39-15-402(b) (Supp. 2007). "Serious bodily injury" is defined as bodily injury involving a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Id. § 39-11-106(a)(34) (Supp. 2007). Aggravated child abuse is a nature-of-conduct offense, which means that "the evidence must be sufficient for a rational jury to have concluded, beyond a reasonable doubt, that the defendant was aware of the nature of his conduct when he treated the victim in such a manner as to inflict injury, and that, in so doing, he acted other than by accidental means." Dorantes, 331 S.W.3d at 386 (citing Hanson, 279 S.W.3d at 277); see State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000) (holding that the evidence was sufficient to sustain the convictions for aggravated child abuse when the proof showed that the defendant "knowingly parked her car, rolled up the windows, securely fastened the children in the car, locked the car and left them inside . . . from approximately 3:45 a.m. to between 12 and 1 p.m." regardless of whether the defendant was aware that her conduct would cause the children's hyperthermia).

Viewed in the light most favorable to the State, the evidence established that the victim, who was just over two months old at the time of his injuries, sustained at least thirty fractures to his arms, ribs, and legs. Dr. Abrams and Dr. Perales testified that the victim's injuries were from non-accidental trauma, and Dr. Meservy testified that the various fractures and the differing ages of the fractures indicated child abuse.

Although there were no witnesses who saw Lowery inflict the victim's non-accidental injuries, the State presented substantial evidence from which the jury could find him guilty beyond a reasonable doubt of the charged offenses. Lowery and the victim's mother testified that Lowery was the only person awake with the victim each night from approximately 9:00 p.m. until 1:30 or 2:00 a.m. On the way to the hospital on January 24, 2008, Lowery told the victim's mother that the victim's injuries "had to have been something [he] had done." At the hospital, when informed that the victim had sustained multiple fractures to his arms, ribs, and legs, Lowery admitted to Detective Boucher that "nothing was on [his wife]; it's all on me." He then admitted to various types of conduct that could have injured the victim before reducing his admissions to a written statement. Immediately upon returning home from the hospital, Lowery told his wife that it was "probably best for him to leave" their home, and she agreed. At a juvenile court proceeding four days later, Lowery reiterated the ways he could have injured the victim and testified that his wife was "a perfect mom" who "would not harm [her sons]" in any way. Lowery acknowledged that he had never observed his wife harming the victim or doing anything to make him believe she was responsible for the

-15-

victim's injuries. Throughout the trial, Lowery never accused family members or other individuals of being responsible for the victim's injuries. Although Lowery maintains that the State failed to prove he was the person responsible for the victim's non-accidental injuries, the jury found him guilty of all three counts after evaluating the credibility of the witnesses, determining the weight given to witnesses' testimony, and reconciling all conflicts in the evidence. See Campbell, 245 S.W.3d at 335. In light of the proof presented at trial, we cannot conclude that Lowery's convictions were "based solely upon conjecture, guess, speculation, or a mere possibility." See Cooper, 736 S.W.2d 125, 129.

Lowery specifically claims the evidence is insufficient to sustain his convictions because none of the experts testified that the victim could have been injured by his admitted conduct. However, the record shows that Dr. Meservy and Dr. Perales testified that some of the victim's injuries could have been caused by the conduct Lowery described in his written statement. Although Dr. Meservy opined that the victim's legs and ribs could not have been fractured in the way Lowery explained, he stated that Lowery could have fractured the victim's arm by pulling the victim out of his swing. Dr. Perales also testified that Lowery could have fractured the victim's arm by jerking or pulling on the victim's arm to pick him up. In addition, Dr. Perales stated that Lowery's description of grabbing the victim's legs, sliding the victim across the bed, and standing the child up could have caused some of the victim's leg fractures. She noted that the leg fractures had to have been caused by a "twisting, yanking motion" with "excessive force." Although Dr. Abrams, Dr. Meservy, and Dr. Perales opined that some of the conduct described by Lowery could not have caused the victim's injuries, the jury was free to conclude that Lowery admitted to some "accidental" conduct in an attempt to minimize his culpability for the victim's injuries. Given the evidence presented at trial, a rational jury could have found that Lowery knowingly, other than by accidental means, treated the victim in such a manner as to inflict serious bodily injury. He is not entitled to relief.

## CONCLUSION

Lowery's convictions are affirmed but the case is remanded for entry of corrected judgments in counts 1, 2, and 3 to reflect that he was charged with and convicted of three counts of aggravated child abuse and that these convictions are Class A felonies.

_____
CAMILLE R. McMULLEN, JUDGE

-16-